UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| IMRE KIFOR, individually and on behalf of all others similarly situated, Plaintiff, v. | Case No: |
| THE COMMONWEALTH OF MASSACHUSETTS, MIDDLESEX PROBATE AND FAMILY COURT, MASS. DOR CHILD SUPPORT ENFORCEMENT DIVISION, YALE SCHOOL OF MEDICINE (YALE UNIVERSITY), THE COUNSELING CENTER OF NEW ENGLAND, ATRIUS HEALTH, Defendants. | **JURY DEMANDED** |

## CLASS ACTION COMPLAINT

The Plaintiff, Imre Kifor, ("Father"), respectfully alleges as follows:

### INTRODUCTION

1) Ideally government entities should be incapable of forming criminal intent. And public policy prohibits imposing punitive damages on public entities to be paid by taxpayers. While public policy concerns for innocent taxpayer burden could be absent in the case of mere injunctive remedies, this complaint nevertheless contends that the many federal taxpayers are played against and defrauded with child-predatory schemes to benefit solely the few state taxpayers.

2) Plaintiff demands an accounting, monetary damages, treble damages, and equitable relief.

### JURISDICTION

3) This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), ("Civil RICO"). Nationwide service of process is pursuant to 18 U.S.C. § 1965(b). This Court has personal jurisdiction because the Defendant Middlesex Probate And Family Court, ("Family Court"), committed the described tortious acts in this district.

4) Father invokes this Court's diversity jurisdiction as parties from multiple states are involved
with allegations in excess of $75,000. Father also invokes jurisdiction under the Class Action
Fairness act as the dispute involves monetary damages in excess of $5,000,000. This Court
has supplemental jurisdiction over the claims made under Massachusetts State law pursuant
to 28 U.S.C. § 1367. State courts have concurrent jurisdiction over RICO claims. However,
Father's pending lawsuit in state court[1] is about discriminations against him and violations of
his civil rights. Moreover, Father could not have brought these Civil RICO claims any earlier.

## VENUE

5) Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391
because Family Court is subject to personal jurisdiction in this judicial district and resides in
this district. The Defendants are jointly engaged in wrongful conduct in this district and have
such minimum contacts with this district that exercising jurisdiction is just and reasonable.

## PARTIES

6) Father is a naturalized US citizen residing in Newton, MA, who was defrauded, defamed and
discriminated against by Defendants' long-term racketeering scheme to silence and enslave.

7) The Defendant Commonwealth of Massachusetts is a state government. Family Court and the
Department Of Revenue, ("DOR"), are governmental adjudicatory bodies or agencies. A suit
against an agency of the Commonwealth is the same as a suit against the Commonwealth.

8) The Defendant Yale School Of Medicine is a public corporation, a medical and mental health
provider with headquarters at Yale University, 333 Cedar Street, New Haven, CT 06520.

9) The Defendant The Counseling Center Of New England is a public corporation, a medical,
mental health and therapy provider with headquarters at 1 Main Street Nashua, NH 03064.

---

[1] Middlesex Superior Court 2181CV00921.

10) The Defendant Atrius Health is a public corporation, a healthcare provider for adult and pediatric patients at 30+ locations, headquartered at 275 Grove Street, Newton, MA 02466.

## ABSOLUTE JUDICIAL AND SOVEREIGN IMMUNITY

11) Absolute judicial immunity uniformly applies to judges performing judicial acts within their jurisdictions. The protection it affords applies even if the official "acted maliciously and corruptly in exercising judicial functions" or "in the presence of grave procedural errors."

12) "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority, but rather he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction ,' *Bradley v. Fisher, 13 Wall.* 335, 351. Pp. 355-357." Stump v. Sparkman, 435 U.S. 349 (1978).

13) "Immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Bradley v. Fisher, 13 Wall.*" Mireles v. Waco, 502 U.S. 9, 11-12 (1991).

14) This complaint is restricted to only those judicial acts where a family trial court (therefore lacking appellate jurisdiction) pretended to be an appeals court. Father claims with specificity that "in the nature of certiorari" acts were performed with "complete absence of jurisdiction."

15) A petition submitted to the Mass. Supreme Judicial Court re: such deliberate preclusions and the resulting impossibility of appealing Family Court's acts is attached as an affidavit (of new inquiries of whether self-abrogation of immunity causes abrogation of sovereign immunity).

## FACTUAL ELEMENTS OF THE RICO SCHEME

16) Federal reimbursements associated with child supports (CSE) are defined and reported to the US Congress by the Congressional Research Service (CRS). CRS documents in the *Child*

*Support Enforcement: Program Basics (1/6/2021)[2]*: "The program is a federal-state matching grant program under which states must spend money in order to receive federal funding. For every dollar a state spends... it generally is reimbursed 66 cents... Pursuant to federal law, the court cannot retroactively reduce the arrearages that a noncustodial parent owes."

17) CRS also documents in the *Child Support Enforcement Program Incentive Payments: Background and Policy Issues (5/2/2013)*: "individual states have to compete with each other for their share of the capped funds... payment system requires that the incentive payment be reinvested by the state into the program... penalties may also be assessed when the calculated level of performance fails to achieve a specified level or when states are not in compliance."

18) CRS also documents in the *Demographic and Socioeconomic Characteristics of Nonresident Parents (10/18/2021)*: "A majority of nonresident parents (5.4 million) reported paying child support in 2017... and the estimated total amount paid in child support was $33.8 billion... nonresident parents were disproportionately likely to be male... in 2018 the majority of parents were white, non-hispanic, including 54% (5.2 million) of nonresident parents."

19) **Enterprise**. This complaint refers to the "association in fact" between the Family Court (also including its practicing attorneys or "trusted officers," its Guardian ad Litems, ("GAL"s), its supervised visitation centers, etc.) and the other Defendants as a legitimate RICO enterprise.

20) This Enterprise has (1) a shared purpose of investigating, determining, and enforcing child support payments (and then collecting the federal reimbursements); (2) a charter, a continuity and a longevity of its structure; and (3) all members depending on and working in concert/ coordination with each other to pursue the shared interest (incentivized by professional fees).

---

[2] See https://crsreports.congress.gov

21) The members of this Enterprise are banded together to perform the above multifaceted tasks that they could not perform on their own. The level of the cooperation in this Enterprise is above the level of cooperation inherent in other normal and regular commercial transactions.

22) The Family Court is the *de facto* "hub" of this Enterprise with all other Defendants being the service provider "spokes." This coherent group functions together with the members knowing the general nature of the Enterprise and that it extends beyond each member's individual role.

23) This Enterprise is by definition more than any corporate defendant carrying out its ordinary business through a unified corporate structure unrelated to the racketeering activity presented below. RICO was designed to prevent any such illicit infiltration of legitimate enterprises.

24) **Objectives**. The Commonwealth openly seeks to maximize federal reimbursements (despite potential harm to its taxpayers): "federal receipts associated with the child support computer network shall be drawn down at the highest possible rate of reimbursement ... as reported in the state accounting system for federal incentives and the network ... $38,887,046."[3]

25) Between 2012 and 2022 a total of $33M + $35M + $35M + $37M + $34M + $29M + $28M + $30M + $34M + $38M + $38M = $371M federal reimbursement amounts were reported.

26) Competing against all other states, this can be accomplished only by: (1) targeting families with more resources, (2) maximizing each support amount by forcefully and fully separating children from their nonresident parents, (3) allowing fabrications of "high-conflicts" into the cases only to incentivize the "feeder network" of colluding professionals, (4) hiding the thus induced legal struggle by "cooking" the docket records, and (5) concealing any wrongdoing with protecting schemes from discovery, or appeals, and federal penalty inducing corrections.

---

[3] See https://malegislature.gov/Budget/FY2022/FinalBudget at 1201-0160.

27) **Interstate Commerce**. By the definition of this Enterprise, as it aims to maximize federal reimbursements (and their subsequent reinvestments in a positive feedback loop), the RICO interstate commerce requirement is satisfied by its direct affect on thus "federal" commerce.

28) The American Bar Association asserts: "it is estimated that only 10 percent of family law disputes end up going to trial, whereupon they take up the lion's share of work for family courts. One might assume that these rare cases exclusively involve highly complicated divisions of property or particularly irregular custody disputes. Instead, a significant percentage of the most fractious family law cases do not involve complex legal issues, but rather they involve individuals who appear to be bafflingly unable to resolve their disputes."[4]

29) The layman Father contends that law professionals, with "no skin in the game" yet obscenely lucrative incentives, are not just biased against American families but are also concealing the facts. Through this 10+ years-long pattern of "high-conflict" inducing "mental health" fraud, defamations and discriminations, combined with the herein documented RICO scheme of concealment and retaliations, he has lost $1M+ in "legal fees" as part of his $9M in damages.

30) **Racketeering Activities**. This complaint refers to allegations of § 1961(1) retaliations and mail (and wire) fraud as the offenses or "predicate acts" of the RICO racketeering activities.

31) Pursuant to Fed. R. Civ. P. § 9(b), the herein pleadings of fraud have time, place, parties, and content of the misrepresentations specificity, showing the deception by the communications.

32) The scheme behind the intent of the Racketeering Activities was to deceive a prepared Father in his affirmed efforts to appeal the Family Court's decisions & to conceal from and sabotage any appellate reviews of filed evidences and/or docket entries. Mails and/or wires (internet and emails) were used to further this deception scheme with "property in Father's hands."

---

[4] See https://www.americanbar.org/groups/family_law/publications/family-law-quarterly/volume-53/issue-2/confronting-challenge-the-highconflict-personality-family-court/ (the relevant part of the article is attached).

33) With severely restricted public access to Family Court's dockets entries, Father's only option was to learn from and rely on mailed (or emailed) decisions when attempting to appeal them.

34) The Family Court also had a duty to disclose their decisions yet on multiple crucial occasions Family Court deliberately omitted notifying Father altogether (perhaps to preempt appeals).

35) Father's relentless diligence (of filing pleadings, affidavits and exhibits throughout the ~80 hearings) was countered by Family Court's fraudulent concealment through therefore active misleading with affirmative steps or conduct (e.g. banning him from filing pleadings at all).

36) **Racketeering Schemes**. Multiple racketeering schemes have been deployed to silence and enslave Father, directly and/or proximately causing Father's injuries and pecuniary damages:

37) <u>Secrecy Scheme</u>: by not notifying him, Family Court preempted Father's chances of appeal (one cannot appeal an unknown ruling), <u>Deception Scheme</u>: deliberately asserting falsities in mailed orders caused confusion (and inordinate amounts of effort to correct), <u>Ignore Scheme</u>: Family Court ignored Father's verified submissions (to keep public records consistent with fraud), <u>Retaliate Scheme</u>: Family Court allowed or fabricated ambiguous contempt actions to keep Father under the endless threat of silencing jail sentences, and <u>Usury Scheme</u>: Family Court deliberately forced usury rates on a thus forcedly indigent Father only to enslave him.

38) By keeping docket records inconsistent with reality, and by fabricating contempt actions to retaliate against a whistleblower Father, the Family Court turned the wrongs self-concealing.

39) **Patterns of Racketeering**. The above Racketeering Activities started less than ten years ago and have continued through related acts forming § 1961(5) RICO patterns of racketeering.

40) All the acts have the same or similar purposes, results, participants, victims, methods of commission, or are interrelated by specific characteristics, and are never isolated events.

41) The patterns are open-ended schemes in that they have been an almost ten years-long chain of related misconducts, with a just established threat of continuity. Despite Father being only one person, still two mothers, three independent Family Court dockets, four separate GALs, seven consecutive judges, twenty-one doctors and therapists, and thirty lawyers are involved.

42) Multiple simultaneous schemes have been active at all times leading to the allegation that the intention had been to silence and enslave Father. Patterns of unlawful conduct exists with: (1) many predicate acts; (2) of differing variety; (3) over an almost ten years-long period; (4) on multiple parallel (split) victims; (5) through separate schemes; and (6) with distinct injuries.

43) As adjudging complaints of contempt re: in-arrears child supports are part of Family Court's regular way of conducting its business (with deliberately forced indigences and fabricated child-predatory ambiguities aside), the threat of open-ended continuity (i.e. "past conduct that by its nature projects into the future with a threat of repetition") continues to persists.

44) There is no reason to suppose that any of the alleged misconducts by the Family Court, (e.g. retaliations and preclusion of appeals), would not continue indefinitely without this lawsuit.

45) Family Court's basic duties and regular way of conducting business also satisfy the "vertical relatedness" criteria, i.e. Family Court was enabled to commit the offenses solely because of its position in the Enterprise and its involvement in and control over the Enterprise's affairs.

46) For completeness-sake, "horizontal relatedness" exists and is proven by the predicate acts having similarities regarding purposes, results, participants, victims, methods of commission.

47) As the underlying wrongdoing is exposed by a whistleblower, the Family Court's retaliatory acts are inherently connected to those schemes, therefore satisfying relatedness requirements.

48) **Culpable Person**. As an entity capable of holding a legal or beneficial interest in property, Family Court is a member of the above larger Enterprise. As a trial court, Family Court has

under the "color of the law" jurisdiction and duty to manage and operate the different actors

involved in the different, and therefore distinct, events of the above legitimate Enterprise.

49) RICO claims may be appropriate against government employees who commit predicate acts.

50) By pretending to also be an appeals court (without any appellate jurisdiction), Family Court

has deliberately abrogated its absolute judicial immunity and has therefore become a RICO

culpable person, ensuring that the distinction exists between the Enterprise and the Patterns.

51) **Injuries**. Father is (1) a person (2) who sustained injury (3) to his business or property (4)

by reason of the Defendants' violation of 18 U.S.C. § 1962. The RICO violations and Father's

injuries are independently alleged. Therefore, Father has a standing for Civil RICO claims.

52) Father has realized economic injuries from herein interferences in his business or property.

53) The now forcedly indigent Father's significant financial and existential losses are concrete.

54) Father's injuries are also ascertainable and definable because he has been deprived of his

ability to use or to transfer his now sole remaining property, his saved intellectual property.

55) All of Father's injuries have been foreseeable and natural consequences of herein schemes.

56) Father's licenses were suspended on purpose and then he was deliberately ordered by Family

Court to seek unskilled work (i.e. requiring mandatory physical transportation). The forcedly

indigent Father was later sentenced and his pecuniary losses due to false imprisonment were

discrete injuries to his business or property (that were not derivative of any personal injuries).

57) Father's access to the timely appeals process (Mass. G.L.c. 215 § 9) was repeatedly denied

without any explanations by Family Court, and Father suffered injury to this property right.

58) Even the Chief Justice of the Family Court wrote on 3/6/2019: "If you believe that a final

decision in your case is legally wrong, you may have a right to appeal the decision. There is

also a right to appeal some types of orders that are not final, called interlocutory orders."

59) RICO injuries are ones that are "by reason of" RICO violations, requiring direct relation (i.e. factual and proximate causations) between injuries asserted and injurious conducts alleged.

60) The Defendants' systemic and sustained allegedly wrongful conduct directly caused Father's economic losses as therefore intended consequences of the Defendants' unlawful behavior.

61) RICO injuries cannot be mere reaffirmations of previous acts. Father's business or property is specifically contextualized and encapsulated by Father's software startup, Quantapix, Inc.

62) The inception of the one-person company coincides with the start of the herein sequence of RICO violations. Therefore, Father's injuries to his business or property are formally tracked by already submitted corporate records also showing causations other than "market factors."

63) Father's business or property (e.g. his professional reputation & ability to gain employment) have been directly damaged by the **false** public allegations about his "mental health," "**rape**, battery, and violence," "**child abuse**," "financial control," and generic "toxic masculinity."

64) To escalate the child-predatory conflict to the limit, Family Court assigned notoriously cruel "high-conflict" expert GALs (the activist "feminist" Harvard psychologists, Drs. Deutsch and Olezeski) to one of the cases to custom fabricate infantile and dogmatic crude narratives like: "[Girl] is afraid the Father will 'put suction cups on her feet and take her out the window,' and [Boy] is afraid Father would 'put him in boiling water' if he went back in Father's care."

65) As the GALs fully refused to consider the submitted volumes of evidence (that also directly contradicted their pre-existing and boiler-plated binary "victim" scripts, e.g. "mother either lacks affect or was bullied into abandoning her 3.5 yo twins"), the "superstar" GALs' scheme of stereotypically targeted massive invalidations was obscenely profitable for them at ~$55K.

66) Family Court's assignment of the parallel GAL investigation (of the effectively identical facts and events) to a balanced but later bullied-in-court Dr. Somers costed ten times less, at ~$5K.

- 10 -

67) **Classes of Injuries**. Father's injuries stem from (1) committed predicate acts, or 18 U.S.C. § 1962(c) violations; (2) the investment of racketeering income, or § 1962(a) violations; (3) the acquisition of an interest in and/or control over the Enterprise, or § 1962(b) violations; and (4) overt acts committed in furtherance of the conspiracy, or § 1962(d) violations.

68) With no jurisdiction § 1962(c) "deception & retaliation" violations of the overall "to silence and enslave" punishments are the bases of Father's realized injuries, as they simultaneously remove any chances of judicial reviews and reparations while also deliberately forcing him to succumb to his sustained monetary injuries as recovery is impossible from a **$275,000+ debt**.

69) § 1962(a) statutory "reinvestment" violations of previously received federal reimbursements have provided Family Court with limitless resources for its comprehensive "war of attrition" on Father to silence and enslave him, despite Father's supposedly "protected" indigent status.

70) § 1962(b) "acquisition" violations have provided Family Court with the means to expand the "feeder network" of professionals who would steadily supply fraudulently obtained "expert" or "trusted" opinions (in exchange for therefore allowed obscene profiteering opportunities) with a deeply child-predatory "baiting and provoking a dedicated and loving parent" agenda.

71) § 1962(d) "conspiracy" violations have allowed Family Court to expand the sphere and the intensity of attacks and retaliations on Father without sacrificing its judicial and/or sovereign immunity. The repeated filing of fraudulent complaints for contempts and the arrest by the Middlesex Sheriff can be attributed to thus conspiring, and financially incentivized, mothers.

72) Father was not the direct recipient of false statements when the two mothers repeatedly filed their complaints. The Family Court's subsequently mailed orders coerced him to obsessively "seek work" (via 10 submitted job applications/week), proximately causing his now 270+ rejected or ignored solicitations for work as he could not withhold his "pending legal issues."

73) **Collection of Unlawful Debt**. The initial child-abusive lawsuits were filed in parallel by the
two mothers with fraudulent pretenses and as the result of their lying to the police, DCF, etc.

74) Therefore, Family Court awarded only partial child supports to mothers in 2011. As Father
had been the sole physical and full-time custodian of his twins for the prior 4 years, Family
Court imputed an income for him. That amount was expanded to full support coverage only
in 2014, after he had been forcefully and completely stripped of custodies for his children.

75) The speculatively imputed off-and-on child supports were originally determined by Family
Court in a deceptive "gambling" style, based on deliberate systemic fraud & discriminations.

76) Since the DOR's 2019 involvement, aided by the mothers' conspiracy, Family Court relied on
weekly mailed attempts to collect "an unlawful debt" as an aggravated federal felony threat.

77) The forcedly indigent Father has been diligently attempting to correct the ordered ~$5,000/
month obligations for his children since 2018, with the 4th such attempt filed on 6/23/2022.

78) To avoid appellate reviews and thus potential penalties, Family Court has resorted to RICO
predicate act violations when simultaneously sabotaging and retaliating against Father's
defensive steps to avoid the usurious debt (now $275,000+) from endlessly accumulating.

79) Despite Father's repeated requests for reviews (of the alleged or implied deceptions and
retaliations by Family Court), both the DOR and the Commonwealth continue to agree with
and to directly condone the Family Court's ongoing and documented predicate act violations.

80) **Statutes of Limitations**. Father first learned about his injuries on 8/3/2012 from the trial
testimonies (and prior depositions) of Dr. Deutsch, Father's ex-wife, and a police officer.

81) Despite the police officer's justification for not arresting Father (due to inconsistencies in
mother's story), the "bullied" ex-wife's suborned perjury about her millions of dollars, the

GAL's deliberate deceptions (and her later "inability" to recall details of the investigations), etc., Family Court still proceeded to forcefully block Father's diligent efforts for self-defense.

82) Specifically, Father's submitted 110 pages affidavit of 973 verifiable errors of the faulty GAL reports was immediately discarded and then quietly buried by Family Court. Dr. Deutsch also testified that she had relied on Dr. Olezeski's (now at Yale Medical School) defective, biased and **sex-obsessed "psych testing"** to conclude their "possible personality disorders" claims.

83) Family Court (and the conspiring mothers) continued to use this "mental health" fraud and defamation against Father to this day, despite his filed repeated full psychiatric evaluations by 3 Harvard clinical psychiatrist, all senior superiors of the "activist" psychologist GALs.

84) Supported claims show that the "impounded" information was fraudulently concealed and Father could not discover the facts nor appeal the subsequent decisions, despite his diligence.

85) Father argues that the four-year statute of limitations is to be equitable tolled because he first learned about the justifications of the causes of prior injuries from the faulty, inconsistent and also secret Family Court docket entries served on him by the Assistant AG only on 8/9/2021.

86) While Father was aware of the injuries to his business or property (due to defamatory and discriminatory after-effects of the fraud-based police, DCF, GAL, etc. investigations), Father still could not discover the pattern necessary to overcome the immunities of the bad actors.

87) A disconnected pattern only started to emerge when the two medical doctors (Drs. Goldsmith and Kurens from Atrius Health), openly conspired to forcefully medicate and brainwash his traumatized children (as a "protection" from Father's "toxic masculinity"), while sending the children into the years-long colluding "care" of out-of-state doctors (Drs. Lawson, Gallagher, Tempesta, Katragadda & Magee) at The Counseling Center Of New England in Nashua, NH.

88) **Diligence Efforts**. To resist Father, they all demanded from Family Court to strip his legal custody of his twins on 4/22/2013, less they would "refuse to continue treating" the children.

89) Proof of Father's relentless diligence efforts in court are the Family Court's specific orders to severely restrict his filings (12/5/2013, 8/24/2018, 1/11/2019, 4/24/2019) and to ban his public complaints (9/26/2018, 4/11/2019), resulting in his now 500+ open letters to officials and to the US Congress. A sampling is attached to substantiate Father's vocal desperation.

90) To further provoke the legal custody matters for court purposes, Dr. Goldsmith knowingly forced Father's son to also undergo an unnecessary and painful "cancer" surgery at Mass. General Hospital, relying on fraudulent medical insurance to eliminate accounting traces.

91) Witnessing the little boy's deliberate medical torturing for Family Court's purposes, Father withdrew legal consent from Atrius Health and The Counseling Center to treat his children.

92) The statutes of limitations clock is not affected by these discoveries. As only the necessary other elements of the patterns were uncovered, proximately caused injuries were left intact.

93) **Injury Discovery**. Pursuant to this rule, Father was first injured by the first predicate act on 12/5/2013 when Family Court omitted mailing a therefore impossible to appeal denial. Father learned about the denial on 6/30/2014, at which time a simultaneous appeal of both colluding parallel cases became predictably impossible (as the parallel judgment was dated 2/13/2014).

94) Federal law holds that a limitations period cannot begin to run until the cause of action is complete. Father's cause of action completed only on 8/9/2021 when he learned from the AGO that the 12/5/2013 denial was recorded in the Family Court docket entries 6+ months after it could have been appealed, therefore rendering the omitted mailings a deliberate fraud.

95) Therefore, Father alleges fraudulent concealment, as (1) Family Court actively & wrongfully concealed material facts relating to the wrongdoing; (2) the concealment prevented Father's

- 14 -

discovery of the nature of the claims within the limitations period; and (3) Father exercised

relentless due diligence in pursuing the discovery of the claims during the to be tolled period.

96) Confirmed proof of Father's forced unemployability arrived only on 6/3/2022 when Family

Court dismissed (with a cancelled hearing), its own secretive complaint for contempt as he

had been fully and unconditionally complying with the court's all prior "seek work" orders.

97) The preclusion of appeals pattern was discovered when Father's first notice of appeal (filed

on 7/1/2019) was ignored by Family Court, and it has existed since then through the 9 out of

11 ignored notices of appeals, properly and timely filed on 7/1/2019, 11/7/2019, 1/7/2020,

2/12/2020, 6/24/2021, 6/29/2021, 7/18/2021, 8/18/2021, 8/25/2021, respectively. All of

Father's submitted notices of appeals were accompanied by signed affidavits of indigences.

98) The preclusion of the appeals pattern was verified by Mass. Appeals Court on 6/23/2022 by

noting "As described infra, we consider only the appeals from judgments that are properly

before us: the denial of Kifor's motion for reconsideration in the Probate Court action with

Duchesne; and the June 4, 2021 order and June 23, 2021 dismissal in the Probate Court

action with Oulton." It was confirmed that, due to Family Court's deliberate sabotaging of

the appeals processes, key judgments of the cases (that all subsequent contempt actions build

on) are effectively unappealable, regardless of Father's repeated timely rule-based efforts.

99) Father could not have filed the herein complaint any earlier without these two (6/3/2022 and

6/23/2022) confirmations and verifications directly from the Family and the Appeals Courts.

## SUPPORTED FACTUAL ALLEGATIONS

100) Due to "concern that professionals who provide service to the court will be harmed by what

he puts out on the Internet," Family Court repeatedly denied (on 2/12/2018, 12/17/2018, and

4/11/2019) Father's desperate motions to publish to raise funds for his existential struggle.

101) Family Court's denials started after Father's "Castrating young American boys?" email (on 1/12/2018) drew focus on his personal experiences with Dr. Olezeski and her child-predatory and fraud-based professional past (contrasted with her current "Pediatric Gender Program").

102) A Yale attorney started following Father's desperate email communications, see "Contact information for Court notices" (2/16/2018), "Dr. Deutsch, an American Dr. Mengele from Harvard" (4/28/2018), "Divorce Law Rigged To Torture Children" (9/15/2018), and "AI software to protect children and to battle the tyranny of the minority" (8/4/2019) emails.

103) An Atrius Health attorney had already banned and threatened the never violent Father with police action, see "Re: Dr. Ronni Goldsmith and NO TRESPASS NOTICE" (11/17/2017) letter, "Re: voicemail" (1/3/2018) email, "Re: Atrius Health personnel" (10/16/2018) letter.

104) The superintendents of the two districts of Father's children's schools baselessly banned and threatened Father with police action (2/6/2018, 2/16/2018) for Family Court's purposes.

105) Father's rights to submit evidence and call witnesses, to prove his innocence and indigency, were then all denied (12/17/2018, 4/24/2019, 6/6/2019, 10/7/2019, 10/22/2019, 12/2/2019).

106) As Father had been alleging documented child-predatory "mental health" fraud (2/20/2019, 4/11/2019), driven by discriminatory activism allowed in and encouraged by Family Court (12/17/2018), Father was labelled "dangerous" and was then forcefully silenced (4/11/2019, 4/24/2019, 6/6/2019, 10/7/2019), sent to jail (10/21/2019), and arrested again (1/21/2022).

107) The Family Court has dogmatically maintained that Father had been able to earn "at least minimum wage" (12/6/2019), and refused to accept his experiences of fraud, defamation and discriminations. All of Father's requests for investigations and reparations have been denied.

108) Without due process, Family Court took & canceled Father's entire professional life only to silence him, "So it's no more 'I have the software.' Go apply to jobs. Get a job" (4/24/2019).

109) Family Court's ambiguous routine orders were meant to forcefully keep "toxic fathers" in contempt of court (9/26/2018, 6/13/2019, 10/15/2019). The hasty orders failed to cover the cases when Father would be responding after his children had contacted him (3/13/2021).

110) Family Court allowed subornation of perjury by an ARC on Father's children (4/24/2019), when claiming "both children were adamant that neither wants a relationship with Father," while ignoring Father's submissions once his children contacted him (7/15/2021, 1/21/2022).

111) The court-enforced and subsidized "supervised visitations" consistently targeted Father's bonds with his two daughters by relentlessly cancelling and/or fabricating endless obstacles.

112) Father has documented that the fraudulently ordered 500+ supervised visitations with his four children were discriminating and harassing to him, by coercing Father to endlessly take his children to the movies (where he could not nurture his connection with them), and in the dark theaters the "activist feminist" monitors forcefully separated Father from his daughter, while baselessly insinuating "protection" (i.e. proclaiming to Father "I need to protect you").

113) Family Court compelled the mother to serve her complaint for contempt (8/20/2019) only to then close it without notice 2+ years later (12/13/2021). Father holds that a complaint closed on 12/13/2021 and another dismissed on 6/3/2022 should not result in a still active complaint for contempt on 6/7/2022 (see the 6/7/2022 logs of dockets 11W-0787-WD/11W-1147-WD).

114) Only interested in "silencing by enslaving" a whistleblower, Family Court ignored Father's efforts and his ~800 solicitations for jobs or contracts emailed in compliance (8/4/2019). As a 60 yo software engineer with 30+ years experience, Father can either draw from his expertise or work as unskilled labor without intellectual value (270+ job applications on 7/12/2022).

115) The received feedback is clear: "you are not judged on technical merits by engineers, you are judged purely on legal merits (and risks) of your open lawsuits, and only by lawyers."

116) Father's forced and intractable indigency is exploited ad infinitum in Family Court through

endlessly allowed, purposely ambiguous contempt actions (1/19/2019, 8/8/2019, 10/11/2019,

6/21/2021, 11/24/2021, 1/11/2021, 1/21/2022, 5/6/2022, 6/3/2022), that cannot be appealed.

117) The Family Court has delayed these actions (6/4/2021, 6/23/2021, 12/6/2021, 5/6/2022),

while sabotaging their intended appeals (10/5/2020, 6/29/2019, 7/13/2021), only to forcefully

interfere with the appeals process and the prosecution of Father's complaints filed elsewhere.

118) Father still has no driver's license (6/13/2019), he still has no cash, no car, nor any assets,

no insurances of any kind, and he continues to be forcefully kept under an informal house

arrest and in "joint employment,"[5] rendering Father unable to "earn a living" (7/12/2022).

119) Father has now documented that docket entries in Family Court do not reflect the reality of

his filings and the court's orders. The inconsistencies are caused by the herein substantiated

racketeering schemes that have been deployed on purpose to silence and to enslave Father.

120) The above mentioned Secrecy Scheme (of Family Court withholding its decisions from

Father) was repeatedly perpetrated on: 12/5/2013; 2/12/2018 - for his 1/19/2018 motions;

7/1/2019, 11/7/2019, 1/7/2020, 2/12/2020 - for his four notices of appeals and indigency;

11/5/2020 - for decision revealed on 7/13/2021; 6/24/2021, 6/29/2021 - for notices of appeals

and indigency; 8/25/2021 - for notices of appeals; 12/2/2021 - for indigency; 12/13/2021 - for

closing a case; 1/21/2022, 5/6/2022 - for no decisions; 6/3/2022 - for dismissing a case.

121) The Deception Scheme (of Family Court claiming falsities in mailed orders) was repeatedly

perpetrated on: 9/26/2018 - building on trivially ambiguous 2/13/2014 judgment; 4/24/2019,

6/13/2019 - claiming agreement re: children; 8/22/2019 - claiming no harm, injury, damage;

8/8/2019, 10/21/2019, 12/6/2019, 12/6/2021 - claiming ability to pay/get hired; 6/16/2021 -

---

[5] See attached filed renewed petition to the Mass. Supreme Judicial Court (the initial dockets were SJ-2022-0041 and SJC-13263).

finally allowing indigency but sabotaging transcripts; 6/4/2021, 6/23/2021 - deliberately

claiming Appeals Court involvement despite knowing that all appeals had been sabotaged;

8/12/2021, 12/2/2021, 1/12/2022, 4/27/2022 - insinuating staged (but not forced) indigency.

122) The Ignore Scheme (of Family Court ignoring Father's filings and professional efforts) was

repeatedly perpetrated on: 8/24/2018, 6/6/2019, 8/8/2019, 10/21/2019, 6/23/2021, 12/6/2021,

1/21/2022, 5/6/2022, 6/3/2022 - as all of Father's filings were ignored/discarded; 1/6/2020 -

for acknowledging his ignored diligence; 8/8/2019, 12/6/2021, 1/12/2022 - as all of Father's

prior professional efforts (e.g. 800+ emailed solicitations for work) were ignored/discarded;

12/13/2021 - for ordering Father to abandon his company, all his prior work (and intellectual

property) and to also effectively abandon his profession, education and 30+ years of skills.

123) The Retaliate Scheme (of Family Court allowing the relentless filings of fraud-based and

ambiguous complaints for contempt to keep Father under the endless threat of silencing jail

sentences, under implied house arrest, and fully isolated from his children) was repeatedly

perpetrated on: 1/29/2018 - for publicizing long-term child abuse; 1/29/2019, 8/8/2019 - for

inability to pay; 10/11/2019, 6/21/2020, 11/24/2021, 1/21/2022 - for inability to pay and for

contacting his children; 1/11/2022, 5/6/2022, 6/3/2022 - for his inability to gain employment.

124) The Usury Scheme (of Family Court exacting usury rates on a forcedly indigent Father only

to enslave him) was repeatedly perpetrated by a therefore also conspiring DOR and Probation

Dept. on: 6/13/2019 - revoking Father's licenses; 3/4/2020, 8/1/2020, 4/27/2022 - refusing to

review; 12/18/2021, 12/21/2021 - threats of criminal complaint; 6/23/2022 - weekly demand.

125) Threat of continuity of the Family Court's actions exists as Father's filings are still ignored,

hearings are held with no decisions[6], secretive filings (without notifications) are scheduled to

---

[6] See attached filed appeal to the Mass. Supreme Judicial Court (the dockets are SJ-2022-0193 and SJC-13310).

be heard, appeals are banned (or selectively processed) and Father's existential efforts (270+ job applications) are sabotaged, while a new round (the 4th) of complaints for modifications have been filed (1/11/2022, 1/21/2022, 4/29/2022, 5/6/2022, 6/3/2022, 6/23/2022,7/12/2022).

126) Family Court's "with no jurisdiction" violations and "to silence and enslave" punishments are the bases of Father's realized injuries, as they simultaneously remove chances of judicial reviews and reparations while deliberately forcing him to succumb to his pecuniary injuries.

## CLAIMS FOR RELIEF

127) The preponderance standard of proof is used in the following short and plain claims.

128) Intent is inferred from Father's already repeatedly filed evidence showing that Defendants facilitated the fraud and gained money or advantage at his expense. Father's injuries were both factually and proximately caused (the wrongful conduct is a substantial and foreseeable cause and the connection is logical and not speculative) by the alleged RICO violations.

129) The injured Father has standing and the proximate causes establish the Defendants' legal responsibility for Father's injuries. This Court is authorized to grant equitable relief to Father with proven injury to his business or property by reason of Defendants' violations of § 1962.

130) § 1964(a) also provides that courts may issue orders to prevent and restrain such violations.

## CLASS ACTION ALLEGATIONS

131) The GAL, Dr. Deutsch, testified on 8/3/2012 that she had investigated 400 court cases, Dr. Daignault had ~900 GAL cases, Atty. Otis ~60 GAL cases, and Dr. Somers well over 200.

132) Father personally witnessed and documented these same "expert" professionals deliberately deceiving the accommodating Family Court even about the most trivially verifiable details.

133) The class therefore is initially defined as all individuals (i.e. majority white males), who have been compelled to proceed to trials in Family Court (10% of cases as per the ABA) due to alleged stereotypical invalidations and thus churned "activist" investigations (GAL, etc.).

134) Pursuant to Fed. R. Civ. P. § 23(a), (1) the class is so numerous that joinder of all members is impracticable[7]; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

135) Pursuant to Fed. R. Civ. P. § 23(b)(3), (1) the questions of law or fact common to the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

136) No unusual difficulties are likely to be encountered in the management of this action as a class action, and the likelihood of individual members prosecuting separate claims is remote.

137) Moreover, the alleged injuries were caused by a common set of written misrepresentations.

138) Specifically, the same or similar misrepresentations were made to the named plaintiff (i.e. Father) in three separate Family Court dockets. Father is also a representative plaintiff, as he was directly injured for relying to his detriment on purported systemic misrepresentations.

139) Individual questions of causation cannot predominate as the same or similar representations can be made to different members of the proposed class. Father claims that the Defendants made "standard" misrepresentations, and while each plaintiff must prove his own reliance in this case, Father believes that (based on the nature of the misrepresentations at issue) the circumstantial evidence that can be used to show reliance is common to the whole class.

140) Father further asserts that no more immediate victim is better situated to sue than him.

---

[7] The number and identities of class members can be determined through court records, testimonies, and disclosures.

141) The questions of law and fact which are common to the class (and which predominate over questions affecting any individual class member) are as follows:

142) Whether the Defendants violated Civil RICO;

143) Whether the Defendants have engaged in common law fraud;

144) Whether the Defendants' unlawful acts resulted in unjust enrichment;

145) Whether Father and the class are entitled to injunctive and equitable relief;

146) Whether the Defendants' acts were willful, entitling Father and the class to treble and/or punitive damages.

147) Moreover, Father is a member of the class and is committed to prosecuting this action.

148) Father's claims are typical of the claims of the other members of the class.

149) Father does not have interests antagonistic to or in conflict with those that he seeks to represent. Father is, therefore, an adequate representative of the proposed class.

150) The likelihood of individual class members prosecuting separate individual actions is remote due to the relatively small loss suffered by class members as compared to the burden and expense of prosecuting litigations of this nature and magnitude.

151) Absent a class action, the Defendants are likely to avoid liability for their wrongdoing, and the individual class members are unlikely to obtain redress for the wrongs alleged herein.

152) Adjudication of this case on a class-wide basis is manageable by this Court.

## COUNT I RICO § 1962(c)

153) This statute prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering activities. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were "by reason of" the committed predicate acts.

154) This Count is against the Family Court, ("Count I Defendant"), as its culpable person.

155) The above Enterprise is an enterprise whose activities affect interstate commerce.

156) The Count I Defendant is associated with, but is also separate from the Enterprise.

157) The Count I Defendant agreed to and conducted (or managed) and participated in the conduct (or management) of the Enterprise's affairs through patterns of racketeering activity and for the unlawful purpose of intentionally defrauding, silencing and enslaving Father.

158) Specifically, (1) to directly sabotage, actively preclude, and deliberately deceive Father's diligently attempted appeals, Family Court repeatedly engaged in mail and wire fraud re: its discrimination-based orders (that were therefore preserved and later metastasized by Family Court without any appellate jurisdiction), (2) to effectively silence the whistleblower Father, Family Court repeatedly retaliated against him by endlessly forcing him into fabricated and ambiguous contempt actions, and (3) to enslave the forcedly indigent Father with no chance of him escaping, Family Court continues to attempt to collect unlawful usury debt from him.

159) Pursuant to and in furtherance of its fraudulent schemes, Count I Defendant committed multiple related acts of (1) mail and wire fraud, (2) retaliations and (3) attempted collections of unlawful usury debt (of now $275,000+ or ~$5,000/month) Racketeering Activities.

160) These constitute Patterns of Racketeering activities pursuant to 18 U.S.C. § 1961(5).

161) The Count I Defendant has directly conducted (and participated in) the Enterprise's affairs through these claimed Patterns of Racketeering activities in violation of 18 U.S.C. § 1962(c).

162) As a direct and proximate result of the Count I Defendant's Racketeering Activities and violations of 18 U.S.C. § 1962(c), Father has been injured in his business and property in that the original fraud, defamation and discriminations have been made persistent while directly causing his therefore deliberately forced indigency and now demonstrated unemployability.

## COUNT II RICO § 1962(a)

163) This statute prohibits a person from investing in an enterprise any incomes derived from a pattern of racketeering activities. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were "by reason of" such investments.

164) This Count is against the Family Court, ("Count II Defendant"), as its culpable person.

165) The above Enterprise is an enterprise whose activities affect interstate commerce.

166) The Count II Defendant is associated with, but is also separate from the Enterprise.

167) The Count II Defendant used and invested "federal reimbursement" incomes thus directly derived from a pattern of racketeering activities (see prior count) in the interstate Enterprise.

168) Specifically, Family Court has been collecting federal reimbursements as the direct result of its fraudulently maximized (at all costs) child support orders, and these federal incomes were then reinvested to finance the repetition (with no appellate jurisdiction) of the Family Court's racketeering activities (to enforce reimbursable child support collections at maximum rates).

169) The Count II Defendant benefited from violations under respondeat superior principles.

170) The Count II Defendant's racketeering incomes were reinvested in a way that hurt Father.

171) The Count II Defendant's reinvestments of racketeering incomes allowed it to sustain its predicate acts, i.e the repeated retaliations against the forcedly indigent Father via fabricated contempt actions for collecting the usury ~$5,000/month rates of fraud-based child supports.

172) The Count II Defendant's reinvestments of racketeering incomes concealed its racketeering activities by investing the incomes in covering up the fraudulent activity and deterring Father with silencing and other existential threats from seeking assistance through appellate reviews.

173) These constitute Patterns of Racketeering activities pursuant to 18 U.S.C. § 1961(5).

- 24 -

174) The Count II Defendant has deliberately reinvested the incomes from its prior racketeering activities through these claimed Patterns of Racketeering in violation of 18 U.S.C. § 1962(a).

175) As direct and proximate result of the Count II Defendant's Racketeering Activities and violations of 18 U.S.C. § 1962(a), Father has been injured in his business and property in that the forcedly indigent 60 yo Father's all prospective employers can clearly ascertain that he has no chance to realistically comply with any of the attempted collections of the therefore usury rates of child supports by a Family Court financed with effectively unlimited federal resources, rendering Father surely unemployable due to his thus immediate federal felonies.

176) These injuries, that occurred as a direct result of the Count II Defendant's reinvestments of their racketeering income, are distinct from the injuries caused by the commission of the above alleged original predicate acts and the patterns from which the incomes were derived.

## COUNT III RICO § 1962(b)

177) This statute prohibits a person from using a pattern of racketeering activities to acquire or maintain control over an enterprise. The allegations of all prior paragraphs are incorporated herein by reference to show that Father's injuries were "by reason of" the herein defendants' continued acquisitions or maintenance of their interest in or control of the Enterprise.

178) This Count is against all the Defendants, ("Count III Defendants"), as its culpable persons.

179) The above Enterprise is an enterprise whose activities affect interstate commerce.

180) The Count III Defendants are associated with, but are also separate from the Enterprise.

181) The Count III Defendants acquired and maintained interests in and control of the Enterprise through a pattern of "protecting" racketeering activities enforced by Family Court for them.

182) Specifically, as the Family Court's profiteering "trusted officers" (army of attorneys) and assigned known child-predatory "experts" (i.e. activist GALs, therapists, doctors, supervised

visitation monitors), the Count III Defendants deliberately (1) fabricated child-abusive "high-conflicts" for Family Court's purposes of maximizing federal child support reimbursements via thus allowed fraud, defamations and discriminations, (2) retaliated against Father when he attempted to have the Defendants' actions leveraging his 4 children reviewed in Family Court, and (3) collected unlawful usury debt (e.g. 10 times normal GAL expenses; ~$2,000/week forced "therapy" expenses by 6 therapists as "[Dr. Deutsch] emphasized that [they] need to be in very good treatment, not just with psychologists who take the insurance;" health insurance premiums compromised by unnecessary and fraudulently insured "cancer surgery" on a child; forced years-long and out-of-state medicating and brainwashing of children; etc.).

183) The Count III Defendants benefited from violations under respondeat superior principles.

184) Pursuant to and in furtherance of their fraudulent schemes, Count III Defendants committed multiple related acts of (1) mail or wire fraud, (2) retaliations and (3) collections of unlawful usury debt (e.g. exorbitant and fraudulently billed professional fees) Racketeering Activities.

185) These constitute Patterns of Racketeering activities pursuant to 18 U.S.C. § 1961(5).

186) The Count III Defendants have deliberately acquired and maintained interests in and control of the Enterprise through these Patterns of Activities in violation of 18 U.S.C. § 1962(b).

187) As direct and proximate result of the Count III Defendants' Racketeering Activities and violations of 18 U.S.C. § 1962(b), Father has been injured in his business and property in that he suffered (1) pecuniary damages from inflated and fraud-based "professional services" and (2) direct injuries to his professional reputation (and specifically to his business) from the deliberately "cancelling" frauds, systemic defamations and stereotypical discriminations.

188) These injuries were proximately caused by the Count III Defendants, as RICO "persons," gaining a dictating interest in, or control of, the Enterprise through their own patterns of

fraudulent activities. Father's damages arising from these acquisitions and maintenances of control of the Enterprise are distinct and different from the damages that flow from the above predicate acts committed by Family Court to maximize federal child support reimbursements.

### COUNT IV RICO § 1962(d)

189) This statute prohibits a person from conspiring to violate §§ 1962(a), (b), and (c). The allegations of all prior paragraphs are incorporated herein by reference to show that herein claims do not stand alone, and that Father's injuries were actually or proximately caused by the Defendants' deliberate violations of RICO provisions (i.e. them knowingly agreeing to facilitate others, but without them necessarily agreeing to operate or manage the Enterprise).

190) This count is against all the Defendants, ("Count IV Defendants"), as its culpable persons.

191) The above Enterprise is an enterprise whose activities affect interstate commerce.

192) The Count IV Defendants are associated with, but are also separate from the Enterprise.

193) To establish the conspiracy, Father has substantiated the Defendants' agreement: (1) to the overall objective of the conspiracy (i.e. to facilitate the operation of the Enterprise through a pattern of racketeering); and (2) that Family Court would commit at least two predicate acts.

194) One who knowingly participates in a conspiracy is liable for the acts of its co-conspirators and Father was factually injured by the commissions of overt acts as part of the conspiracy.

195) Prior substantiating allegations also enumerate the period of the conspiracy, objective of the conspiracy, and all the actions the alleged conspirators have taken to achieve that purpose.

196) Father's attached "Statement of Facts"[8] substantiate his claims that Count IV Defendants reached an agreement to deprive him of constitutional rights (free speech, due process, equal rights) and the right to appeal a court's decisions. Father thus alleges "meeting of the minds."

---

[8] Filed in Middlesex Superior Court, docket 2181CV00921.

197) The Count IV Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b) and (c).

198) Specifically, (1) the state Defendants agreed and conspired to use or invest income that was derived from the Family Court's pattern of racketeering activity in the interstate Enterprise, § 1962(a); (2) the corporate Defendants agreed and conspired to acquire or maintain interests in the Enterprise through the Family Court and its pattern of racketeering activity, § 1962(b); and (3) all the Defendants agreed and conspired to participate in the conduct of the affairs of the Enterprise through the Family Court and its pattern of racketeering activity, § 1962(c).

199) The Count IV Defendants knew that the committed predicate acts were part of Patterns of Racketeering activities and agreed to the commission of the acts to further their schemes.

200) These constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d), without the necessity to prove that all Defendants knew all of the details of all of the unlawful racketeering activities or the number or identities of the co-conspirators.

201) As direct and proximate result of the Count IV Defendants' conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Father has been injured in his business and property in that the conspiracy among the Defendants effectively creates a "vicious cycle," as no member of the Enterprise is willing to consider providing any relief to Father from his material injuries without all the others simultaneously agreeing.

## PRAYER FOR RELIEF

Father and the class pray for the following relief:

A) An order certifying this case as a class action (with the understanding that the question of whether the Defendants violated Civil RICO is an issue distinct from whether each particular plaintiff is entitled to relief);

B) An order enjoining the Count I, II, III, IV Defendants from their unlawful activities;

- 28 -

C) An order declaring that Father and the class were injured, harmed and their rights deliberately violated by the Count I, II, III, IV Defendants and their unlawful activities;

D) An order awarding Father and the class monetary damages in the amount of $37.1 million (the American Bar Association's cited 10% of the $371M federal reimbursements for 2012-2022), treble damages of $111.3 million, together with legal fees and costs of this action;

E) Order any other relief this Court deems just.

## DEMAND FOR JURY TRIAL

Father hereby demands trial by jury on all claims so triable.

## CERTIFICATION AND CLOSING

Under Fed. R. Civ. P. § 11, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Signed under the pains and penalties of perjury.

Respectfully submitted,

July 13, 2022

/s/ Imre Kifor
Imre Kifor, Pro Se

32 Hickory Cliff Rd.
Newton, MA 02464
ikifor@gmail.com
I have no phone
I have no valid driver's license
I have to move to a homeless shelter
https://femfas.net

## ADDENDUM TABLE OF CONTENTS

American Bar Association - "... High-Conflict... in Family Court" (partial content)     34

6/22/2022 Mass. Supreme Judicial Court ruling (SJC-13263)     .     .     .     36

7/13/2022 SJC - Renewed Petition For Relief (attached as an affidavit)     .     .     38

6/23/2022 Mass. Appeals Court ruling (21-P-503, 21-P-901, and 21-P-902)     .     65

7/13/2022 SJC - Applications For FAR (attached as an affidavit)     .     .     .     70

6/27/2022 Mass. Supreme Judicial Court ruling (SJ-2022-0193)     .     .     .     94

7/4/2022 Notice of Appeal filed with the SJC (attached as an affidavit)     .     .     95

7/18/2022 SJC - Rule 2:21 Memorandum (TBD)     .     .     .     .     .     101

6/17/2022 Statement Of Facts filed with Middlesex Superior Court .     .     .     102

1/19/2018 original motions for relief .     .     .     .     .     .     .     124

8/16/2018 letter from AGO     .     .     .     .     .     .     .     .     127

9/26/2018 mailed court decisions     .     .     .     .     .     .     .     128

10/30/2018 & 11/13/2018 letters from AGO .     .     .     .     .     .     129

12/17/2018 mailed court decisions (count 2) .     .     .     .     .     .     131

1/14/2019 letter from AGO     .     .     .     .     .     .     .     .     133

2/20/2019 mailed court decisions (count 4)     .     .     .     .     .     .     134

3/6/2019 letter from Chief Justice     .     .     .     .     .     .     .     138

4/11/2019 mailed court decisions (count 6)     .     .     .     .     .     .     139

4/24/2019 mailed court decisions (count 4)     .     .     .     .     .     .     145

6/13/2019 DOR Final Determination Of Delinquency     .     .     .     .     150

6/13/2019 mailed court decisions (count 2)     .     .     .     .     .     .     151

7/3/2019 letter from Office Of The Bar Counsel  .  .  .  .  .  154

8/8/2019 mailed court decision  .  .  .  .  .  .  .  155

8/20/2019 mailed court decision  .  .  .  .  .  .  .  157

8/22/2019 mailed court decision  .  .  .  .  .  .  .  158

10/7/2019 mailed court decision  .  .  .  .  .  .  .  160

10/15/2019 mailed court decision  .  .  .  .  .  .  .  161

10/21/2019 mailed court decision  .  .  .  .  .  .  .  162

10/22/2019 mailed court decision  .  .  .  .  .  .  .  164

10/31/2019 letter from Family Court .  .  .  .  .  .  .  165

11/14/2019 letter from AGO  .  .  .  .  .  .  .  166

12/2/2019 mailed court decision  .  .  .  .  .  .  .  167

12/6/2019 mailed court decision  .  .  .  .  .  .  .  168

1/6/2020 mailed court decision  .  .  .  .  .  .  .  170

3/4/2020 letter from the DOR  .  .  .  .  .  .  .  172

8/10/2020 letter from AGO  .  .  .  .  .  .  .  174

3/13/2020 "We need to talk" secret email from children to Father  .  .  .  175

3/31/2021 & 4/27/2021 letters from AGO  .  .  .  .  .  .  177

6/4/2021 mailed court decision  .  .  .  .  .  .  .  179

6/16/2021 mailed court decision  .  .  .  .  .  .  .  180

6/23/2021 mailed court decisions (count 2)  .  .  .  .  .  .  181

6/24/2021 refiled Notices of Appeals (count 2) with **4 ignored originals attached**  183

6/29/2021 filed Notice of Appeal  .  .  .  .  .  .  .  196

7/13/2021 email proof of secretly denied 11/5/2020 affidavit of indigency  .  203

7/18/2021 filed Notice of Appeal . . . . . . . 205

7/22/2021 & 8/12/2021 mailed court decisions (count 2) . . . . 207

8/18/2021 filed Notice of Appeal (and the appealed 7/15/2021 motion/affidavit) . 209

8/25/2021 filed Notices of Appeal (count 2) . . . . . . 218

12/2/2021 emailed court decision . . . . . . . 222

12/6/2021 mailed and emailed court decision . . . . . 223

12/13/2021 mailed and emailed court decision . . . . . 225

12/18/2021 emails with Probation . . . . . . . 227

12/21/2021 emails with Probation . . . . . . . 232

1/12/2022 mailed court decisions (count 2) . . . . . . 236

4/27/2022 response to DOR re: Notice Of Levy and requests for review . . 238

4/29/2022 mailed court decision . . . . . . . 245

6/7/2022 public docket records (count 3 separate dockets) . . . 246, 251, 255

6/23/2022 weekly demand letter from the DOR . . . . . 259

7/12/2022 email to Probation with records of **270+ submitted job applications** . 260

7/13/2022 (Renewed) Complaints For Modifications (count 2, 4th round) . . 274

7/13/2022 Father's Affidavit and Complaint For Conspiracy And Defamation (TBD) 275

Sampling of the 500+ open letters sent to officials . . . . . 283

Additional relevant communications with the Defendants . . . . 298